I want to welcome you here to the Fifth Circuit, and we have a very interesting docket this afternoon, but we would like to move it expeditiously, so we will very much appreciate if you follow the time constraints carefully. When the yellow light comes on, you have two minutes left. When the red light comes on, we ask you to conclude your argument as soon as possible,  We have also read the briefs and the record excerpts. We may not have gotten into the entire record before argument, so we appreciate record citations where those are appropriate. First case of the morning is number 17-40577, U.S. v. Ruiz-Hernandez, and we'll hear from Mr. Sullivan. I would submit if, and I know we all would have hoped this would have happened, my client Mr. Ruiz-Hernandez and this young lady did make it to the other side of the channel. I don't think we would obviously not be here with this enhancement with respect to a death. I would submit we would likewise not be here for creating a risk of serious bodily injury or death. By the government's own testimony, by the government's, the heart of their evidence was there were lots of crossings of this by illegal aliens on numerous occasions. Of this particular channel? Both of them. Oh, well, yeah, I'm sorry, that's incorrect. Yes, this one because it is down in Brownsville. Yes, ma'am. And they, in fact, they say, my recollection of the testimony is that it's frequently used because if you went to an area that's close down by the Rio Grande, closer even to the Gulf of Mexico, you are now clearly set up to have to go through the channel to get there any further. You would have to get across the channel in some method. Correct. Because the channel comes all the way up from Port Isabel down by the mouth of the Rio Grande all the way up to the Brownsville. So it's a fairly long channel. So you would have to go across it. And I think it's frequented on numerous occasions. And that's why I would submit to the court because what's unique about these two provisions, these two enhancements, one is not a lesser included of the other. This Court is aware that frequently they say if this enhancement applies, that one doesn't, or if that enhancement applies, this one doesn't. Both of these can clearly apply. In fact, you see them frequently together. You're talking about the statutory enhancement and then the guidelines enhancement? You're talking about the two guidelines enhancement? Correct. I'm dealing with the two guideline enhancements. And the reason I make that note is that — But are you—I thought you were only contesting the risk of injury guideline enhancement, not the financial gain guideline enhancement. That is correct. I am not challenging financial gain. I am challenging the risk of harm and the causing of death enhancement. Okay. That's what you're focusing on. And also make that point, Judge, because it's always been my opinion, and I think this Court's made this clear in our instructions to us, respectfully, the guilt to innocence. If I were to prevail on that, as I understand the law, I would first of all have to show an irrational verdict. It's plain error because there was no objection on the guilt to innocence. It's getting worse. It gets worse because he got 80 months. With a death, the maximum becomes, as I understand it, is now lifted up to life. Without the death, I think I'm looking at 120 months. I put it there because it goes naturally along with this guideline. But I think I need to be aware of the natural impact of that. 80 months is pretty low for this circumstance. Oh. Normally when these fellows have, you know, when they're driving a truck and it collapses or rolls over or something, they get a lot longer sentences. And, Judge, I would note two circumstances that are there with respect to that. The one that the Court is probably well aware of, that this over the first is the we have to calculate the guidelines correctly. We cannot assume, I think, at this level, as this Court has stated, we can't assume what the Court would do if the guidelines were changed. It would have to go back to the Court, and then the Court would have to make a reasonable decision from those guidelines. That's how I understand what the guidelines are now with respect to the goal read and all that history. How would the guideline not apply when his defense closing said to the jury, it's completely dark on that channel, you can't even see 10 feet in front of you? How could that not be a risk of bodily injury whether boats have lights on or not? That's the beauty of a light in a dark, dark, dark area like that channel. In fact, that is our whole point. It's so dark, the only thing you should have on is your lights. But the point is he would have to anticipate there would be boats without lights. I think it is fair for a person, when you go across that channel, to believe anything in the night is going to have its lights on. Your argument rests on that. You bet it does. Absolutely. I think we've shown that because if you're going down this place in the dark, per the government's evidence, a lot of illegal aliens swimming around, and you decide to turn off your lights, and this is the Coast Guard on top of that. And I understand. I think, to be fair, I need to go at it as if it's any large vessel out there. But I want to keep this rhetorical. I don't want to put me in it. I've never seen a freighter. But why does it even matter they didn't have a light? If he gives her a little toy floaty, that itself creates an extraordinary risk. And one of the reasons that I started with that little statement, unless they said not, the problem with the float is that it worked. Really. Sincerely, it worked. It kept her afloat so she could be run over by the Coast Guard. But I find it strange that we're talking about the quality of the float. When I saw that, I think, well, he got it. I hope we're not going to get to the stage where we're saying, if you guys are going to do this, you need to use either a surfboard or a better quality tube. Because it did work, Your Honor. Because that's not the problem. Because what I would say is also this, Your Honor. And I think I almost said the truth. Judge Jones made the point that some of these sentences, what they've allowed, because I think it's not been used. There's another case where this court made it clear. The but-for causation is real low. The type of risk that's put at harm is a very low standard. They're both very low. But this one case has this unique aspect. Well, let me just comment that we have a – I don't know what that noise is. I must be outside. But we have cases where we have approved enhancements where the aliens simply weren't wearing seatbelts. And an overloaded truck. And, oh, if I could go on and on. Well, and if those kinds of things that other people are known to do when they ride in taxis and so on are sufficient to justify enhancements, I just find that this is a factual finding shielded by error, some kind of standard of protection for the trial court's decision, and it's very hard to overcome. And we're certainly not – it's so clear because it is clear. I think it leans toward clear error because even if it's mixed law and facts, we're still aiming in the same direction. And I think where we have to go at the end, and as I've approached this today and as I've approached it in writing, judge, we are aware we've got to go a good distance. But here's the deal. I would submit to the – when you look at all those cases, since most of those cases involve the highway, most of those cases involve over too many people, but failing to food them – feed them, I'm sorry, food them. It's not food. Failing to feed them, give them water. All of those things have to do with the road. Let me put it over there for a minute. If I'm smuggling into the United States and I'm going across Highway 71 – excuse me, 77 down there by King Ranch, and I'm going to – it's dark, just like it is in South Texas, not well lit anywhere in South Texas. It's dark. It's black. You are out there and you are about to take one illegal alien across the road. I would submit to you that it does not – it is not creating a risk. Go ahead. I would never interrupt the court. Go ahead, Judge. You win. It's not 200 yards wide. And we don't know for sure that it was as dark as you say. It could have been a moonlit night. And you can run across a road, but apparently they were just paddling. Here's what I would say. Let me just ask you this. Sure. I said sure to the court. Yes, Your Honor. I'm sorry. Even if the boat had – even if she could have seen the vessel coming, she could have been in real trouble anyway to avoid a ship bearing down on her in the middle of the night. And it's the old line, the bigger they come, the harder they fall. When you see a freighter coming in a channel, you've got plenty of time to – because remember, it's the point of no return, right? If you're one-third out, you get to go back if you see something coming. You get to the point of no return, maybe that's where you get the most danger, but you still have to go half either way. And by the way, this was a cutter. You get 15 feet away from it, if you've got plenty of time to see it coming, you're not going to get hit by one. I never was hit by one. I've paddled across, I think, 200 times on a surfboard, on a sailboat. I've done everything in that field. I thought the PSR said she didn't know how to swim. So on a surfboard and a sailboat, paddling, sailing, you can maybe change direction. This woman was going where that floaty was going to float. Well, one of the comments he does make in his statement, and Dave Sunbeck is a self-serving – it did match with their facts, by the way, that the light that she – there was a – can she swim or not? Apparently when she got out there, he made the comment she was doing better than me. And once again, they picked a float that worked regardless of her swimming capability because it floated her to the middle. And that's where I guess I had the hardest time. If I could just briefly back to the comment about the highway. If I look both ways, I don't see any lights. I don't hear a car coming. Suddenly some idiot – and there are cars out there that can go this fast now – is going 180 miles with those lights on. Now that's a dangerous highway. And I didn't have anything to do with assuming that risk because I was treating things the way they normally go there. And, yes, I am arguing that's the way things are normally in a shipping channel, that if you're going to go across one, you have time to react. If ships are doing what they're supposed to do – and I think you at least have the right to go that far – they turn on their lights, especially a rescue vessel. This is a first responder. They got run over by a first responder. And, by the way, I'm glad they pointed out that they had their – they disagree with the testimony. That's a 2255 waiting to happen, not my doing. But they decided to bring up that, by the way, the PSR says they had their lights off. And when you first read that, I say that's consistent with the testimony. I'll read the page or two here for a minute. They were asked – the lead agent was asked, what are the main things that are attributed to this accident? They said speed and lighting. To me, that says – to me, if you have your lights on, lighting is not an issue. And if you're going slow enough, I understand you're going into a no-wake zone. There wasn't no wake yet, as they pointed out. However, the testimony did say when you're starting to go into a wake zone, you should start to slow down. You know, if you're in a boat and there's any light at all, you could see another boat. But whether you could see a woman's head bobbing in that water on a tube, that's something else. And one of the reasons – that's actually one of the reasons I'm glad they seemed to think another barge calls them, hey, Coast Guard, why don't you turn on your lights? Oh, we're messing up. You would think when you turn the lights on, you'd start to look around a little bit because everybody's watching you. This was preserved at sentencing, but the standard review is clear error? The standard review is clear error, yes. What's your best case if you have one where a circuit court has reversed a finding of risk of harm? Oh, in fact, our litmus test is bad. And like I said, the way this has been interpreted by every circuit court, and I did. I went to the 10th. I went to the 1st. I went to the 9th. I went to the 9th. I'm sorry. So there is no circuit case? No, I can't get one on point, but neither can they. They can't find me one where it's gotten this outrageous on the government's part. Oh, excuse me, on the other causes is what I would call it. Conceding there could be two but four causes. I'm aware of that. Just quickly on their 28-J letter that you wouldn't have responded to yet, the Garcia case, if you're familiar with it, would that resolve the financial gain argument that you presented in the brief? Yes, financial gain. And, Judge, once again, one of the most typical things as an appellate lawyer sometimes is you want to put the sentencing error first because it's your better error for oral argument to discuss with this court. And the guilt-innocence, if it is non-frivolous, you can put it in there. I'm aware that's not my strongest argument, Your Honor. But is Garcia relevant? Yes, it is. So if they're not family members, not cousins, it's a fair inference that there was a purpose for gain? I agree. Okay. In fact, I'll go ahead and recollect the testimony correctly. He made that up. My client did. Yeah. He said that's my cousin. It wasn't. Okay. Yeah, that's correct. But the one thing I did want to point out, and I was kind of surprised they put this case from the U.S. Supreme Court, not wanting to read out loud, but when I read this, this is why I didn't respond to it. A requirement of proximate cause, I'm not sure proximate cause is the issue here, thus serves to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuitous. That's pure lien. That's the sentencing restitution proximate cause issue. That's pretty not implicated. Yeah, and I'm not sure why they cited a proximate cause issue. I apologize. I'm just trying to — if I think they're going where they're going with this, I think they're trying to say that perhaps the action of the Coast Guard is fortuitous. I don't know. I've got to wait until they come up here and explain. I don't know, and I haven't asked them yet. And obviously I got it two days ago, so I didn't get to see it. But that would be my natural inclination is the more fortuitous action that was on my client's part. One of the things that I also wanted to note, and this is in regards to just so that it's clear, because I do not ever want to misrepresent something that I understand the record to state. Briefly, the homeland security agent in charge of the case said he was asked on cross-examination, did you reveal that one of the factors listed was the darkness of the area? Yes. Was another factor the speed of the boat? I'm not sure on that. And he said, I'm not saying that it was the cause, but they listed certain factors. Do you remember speed being listed? I was made aware that the boat was accelerating. And that's the word I've concentrated throughout is the word was accelerating. And now the light. The light's on. You have time for a bubble. Oh, I apologize. I didn't see the light. That's okay. We have light. Ms. Alanis. May it please the Court, Amy Alanis for the United States. I first wanted to just briefly respond to counsel's comments about the number of aliens that, you know, he says in his reply brief that the ship channel is teeming with aliens. I think if you look at the testimony of one of the port officers, he said that there was some alien traffic at the port. But this wasn't at the port. This was farther down than the ship channel. And just anecdotally, I did talk to my trial AUSA, and he said it's because in 10 years in this job, I have never seen a case where an alien was swimming across the ship channel. So I did ask our trial AUSA down in Brownsville. He said it does happen some, but it's much more common that drugs are transported across the river in that area. So just anecdotally. Is there any part of the river where they don't come across? The river? Well, or the channel. You know, it just fluctuates. It kind of depends on where they ascertain the most law enforcement activities going on, so they'll go somewhere else. Right. This is constantly fluctuating. That whole area is fair game. Yes. And then, of course, here they had to cross the river, and then they walked for four or five hours, and then they swam across or attempted to swim across the ship channel. So you've got two different bodies of water you have to cross in that area, which makes it that much more difficult. On the issue of risk, they're at the ship channel. It's the middle of the night. It's somewhere around 3 in the morning. It's dark. The lady doesn't swim very well, or maybe she doesn't swim at all. They jump in with two little pool floaties. Now, at that point, it seems to me just common sense that there are two risks when you jump into a busy ship channel. And this man, he had worked at the port, and he lived at the shrimp basin, which is a little area just to the north of the ship channel. So he knew. He well knew. And one of the officers here testified. In fact, several officers testified. There is boat traffic on this channel around the clock. Now, you say those are pool floaties. Were they recovered? Yes, they were. Both were recovered. So at the point they jump into this channel, there are two very foreseeable and very common sense risks. One is the risk of drowning, and the other is the risk of being hit by some type of vessel while you're in the ship channel. And both of those things happen to this lady. This may be an elemental question, but does the risk connect at all necessarily to the outcome? Let's say same exact facts, but then lightning hits her and she dies. Enhancement? I think that gets into the whole issue of whether we're going to require proximate cause. And I'm sorry, are you speaking of the statutory enhancement or guidelines enhancement? All he's pushing at this point is the guidelines. So you would think the risk had been created regardless of outcome. I think there are things that could happen that might not fall within the parameters of the guidelines, but I think it would have to be something really out of the blue, like a lightning strike or, you know. Or what if she lets go and drowns? Well, I think it's very foreseeable that somebody is going to lose. It happens. So these enhancements would almost always happen in this type of dangerous circumstance. I think so, too. Again, unless there's just something that is completely out of the blue. I think, yes. And I think the very language of the statute because it doesn't, of the guideline, it doesn't even talk about result or causing. It says if any person died. And so I think we are at but for causation. Is there some outer limit of that? What's the best circuit case that explores these difficult causation questions? Do you know one? Well, I mean, there are several. I mean, there's De Jesus Ojeda in which I think the lady who was talking about this enhancement, all her role in the conspiracy was to go down to the Western Union office and pick up the money that people had sent for the alien smuggling. And she had nothing to do with actually dealing with the aliens, and one of the aliens died out in the brush in August. And that was held to be okay. There was a case out of the- The enhancement was awarded. Pardon me? She got an enhancement. Yes, she did, and this court upheld that. There's also a case out of the, well, that one is actually the statutory cause. That's the statutory enhancement. Well, all this is irrelevant because this is not a far-out case. No, not at all. And I think in- I do want to ask one thing. Does anybody know at what speed the Coast Guard vessel was going? Your Honor, I do not. I understand that the alien's mother has filed a federal tort claims act, so I'm sure all of that will be litigated at some point. Where was the vessel going? What was it in the course of doing? I don't know if it was coming into the port or going out of the port. That was not clear to me on the record, just that they were out there, and, of course, they patrol pretty much 24-7 along the ship channel. Do they cruise? I guess they don't cruise on any kind of regular schedule or anything. I simply don't know, Your Honor. I know they're out there constantly. Are they going to pick a-I mean, I suppose drug smugglers use little boats of some sort? I would imagine. I wouldn't think you'd want to lose your valuable cargo by having someone swarming this channel. But it's not going to help interdiction if you have a lot of lights. The point is to actually catch them, not to have them see your light and get away. Yes. I mean, you know, they are also emergency vehicles. They help, you know, boaters in distress all along the channel and out in the Gulf. So, you know, it's certainly not unforeseeable that one of them would have to accelerate quickly. Did the crew realize they had hit the woman when they did it, or did they just find that out later? They said they heard a thump, and they did stop. In fact, there is a video that was played to the jury from one of the shrimp basin surveillance cameras that shows the vessel over kind of going back and forth looking for something. They recovered one of the floaties, but they did not find the lady. He got the lesser sentence because, but for his disclosure, that no one would have caught him. That is what Judge Togliatti said. I think that was under 5K1.2. She gave him a significant, significant departure. I was going to say, it took him several hours before he reported it. Yes. This happened around 3 in the morning, and I think it was 6.15. He approached the security guard at the shrimp basin, and his clothes were totally dry. So, you know, it seems like he was living at the shrimp basin. He had time to go home and change, and that is when he approached them. And even then, you know, he was prevaricating. He was saying that someone had told him there was a body or an injured person. You know, I think if he had obviously said, I was with her, maybe, you know, it was not really taken all that seriously until later. He called 911. How close together were they, or how far apart? He got hit, too. In the water? Yes. Right together? Again, we do not know. It seemed like they jumped in together. At some point, he said she was ahead of him about eight feet. Yes, he got bumped also. He said he got some type of injury to his arm. They were fairly close together. He's not pressing financial gain. The jury had a question about financial gain. They did, Your Honor. I couldn't see what the answer was. I think they just referred them back to the jury instruction, I think. The jury instruction said either financial gain of him or another person. Does that look correct with the statute? Could it be just financial gain to another person? I know that this court has held that if there's financial payment to one smuggler, that supports a presumption that all were being paid, all the smugglers. And, of course, we have a lot of evidence. It simply wouldn't make sense for somebody like him. Last question, then, from me. It is an apprendee. These issues are beyond a reasonable doubt points of proof. I would have said that, but your brief didn't acknowledge that directly. I'm sorry, Your Honor? Aren't both these statutory enhancements sentencing? What do we call them? Sentencing have to be proven beyond a reasonable doubt. You agree. Okay. There are apprendee factors. Right. You know, for the purposes of the statutory and for the sufficiency, of course. Okay. And so it really doesn't matter. I mean, he got 80 months, you know. Unless you'd have to, for this to matter, the financial gain would have to go away and the death enhancement, guideline enhancement would have to go away. Because otherwise it doesn't matter. Anyway, I just wanted to, again, just emphasize that this was very foreseeable. When you jump into a busy shipping channel in the middle of the night, you know, both of these risks happen to that lady, unfortunately. And if the Court has no further questions, I think I'll rely on my brief for everything else. Thank you. Mr. Sullivan? Your Honor, I'm going to take 30 seconds, if that's okay with the Court, unless the Court has any questions of me. As I understand the Court's previous instructions, the best thing to do is we're here to answer your questions. I would only like to make one note, and that is, smuggling is very dangerous by its very nature, I would submit. There's a lot of case law on that. However, these 16 some odd levels that can come from a death, that can come from creating the risk of a death, we need to keep something separate and distinct to be shown here. Or it should be put back in the statute under the guidelines. It needs to go back in there. These 16 levels would need to be there if we are to say that dangerous situation always applies. But I think it's a different issue that has to be accentuated by the Court. We are aware that the overwhelming number of them, the numbers are against me, the number of times that the Courts have said that's enough. Did you represent Mr. Hernandez at trial? No, ma'am. No, ma'am. I spent a lot of time in Brown, so that's why I'm familiar with the channel and stuff. But both channels, yes, ma'am. It sounds to me as if he made a pretty good deal with the government overall. I can't say. I have to be careful there, Your Honor. All right. Don't see me down there, please. Okay. I thank the Court, though. I've always enjoyed myself here, and I continue to do so. Thank you. We're court-appointed, and you've done a very good job for your client, and thank you very much. Hope you have me back. Thank you, Your Honor. Okay.